**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **REBECCA J. CLARK** | * |
| 6912 Hubbard Road | |
| Hurlock, MD 21643, | * |
| | |
| *Plaintiff,* | * |
| | |
| | * |
| | |
| *v.* | * |
| | |
| | * |
| **CITY OF CAMBRIDGE, MARYLAND** | |
| 410 Academy Street | *   Case No.: _____ |
| Cambridge, MD 21613, | |
| | * |
| *Defendant.* | |

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

_____


Plaintiff, Rebecca J. Clark, Plaintiff, by and through her undersigned counsel, John B. Stolarz, files this Complaint against  the City of Cambridge, Maryland, Defendant, and states as follows:


## I. PARTIES.

1.  Plaintiff Rebecca J. Clark is a White female resident of Hurlock, Maryland in Dorchester County.

2. Defendant City of Cambridge is a municipal governmental unit created and authorized by the laws of Maryland.  It is authorized by law to operate a Police Department.


## II. JURISDICTION AND VENUE.

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action asserts violations of rights secured by the laws of the United States, specifically 42 U.S.C. § 2000e, *et seq.* And 42 U.S.C. § 1981.

4.  Venue is proper in this Court in accordance with 28 U.S.C. § 1931(b) as the events giving

rise to Plaintiff's Claims occurred in the District of Maryland.

5. All applicable prerequisites to bringing this suit have been satsified.

### III. FACTS COMMON TO ALL COUNTS

6. The Plaintiff, Rebecca J. Clark, began working for the City of Cambridge Police Department in 2020.

7. In July of 2025, Plaintiff was appointed Officer in Charge of the Criminal Investigation Division ("CID"), and on September 29, 2025, she was promoted to the rank of Detective Sergeant.

8. Plaintiff's duties included managing the daily operations of CID, case management, assigning officers to investigative calls, and overseeing the Evidence Room.

9. At all relevant times, Deanna Sutton, who is Black, served as the Evidence Technician responsible for the Evidence Room. Her duties included logging and maintaining property and evidence, preserving chain of custody, maintaining documentation, releasing property for court purposes, inventorying and organizing the evidence vault, maintaining supplies, coordinating with allied agencies, and testifying in court proceedings as required.

10. On August 12, 2025, Plaintiff emailed Captain Shane Hinson, her supervisor, advising him of the disorganized condition of the Evidence Room and of Ms. Sutton's refusal to carry a department radio—an essential requirement for responding to crime-scene evidence collection requests. The radio was essential in order for dispatch office to have direct contact regarding related frequent evidence inquiries.

11. Following this report, Plaintiff regularly observed Ms. Sutton disregarding established protocols and procedures. Plaintiff further observed Ms. Sutton frequently absent from her assigned workspace, engaging in personal conversations, walking around the station, and using her cellular phone during work hours. Ms. Sutton also repeatedly failed to comply with Plaintiff's directives to complete assigned tasks and failed to follow directives regarding reorganization of the evidence room.

12. The following are examples of significant performance issues witnessed and reported by Plaintiff:

> A. Upon initial inspection of the evidence room, the room was found to be grossly mismanaged as evidence was observed in trash cans with plastic bins containing evidence stacked on top of each other. Several items were observed unsealed and open without chain of custody attached and biohazard (bloody) clothing was found unpackaged lying out on a

2

counter where individuals inside the room could have contact with it.

B. On or about August 28, 2025, Plaintiff discovered multiple cases requiring laboratory analysis—some pending for months—had not been processed. Certain evidence items from incidents occurring as early as early 2025 had not been documented, secured, or submitted to the appropriate crime laboratory. These lapses involved drug offenses, a domestic assault, a shooting, and malicious destruction of property. One such matter involved a March 28, 2025 drug arrest, where evidence purportedly submitted to the Maryland State Police Crime Laboratory had, in fact, been left on a shelf bearing a handwritten note stating "needs correction," indicating no processing had occurred. Plaintiff reported these deficiencies to Captain Hinson.

C. In a case scheduled for trial, Ms. Sutton had packaged drug evidence obtained from a residence. On September 25, 2025, Plaintiff contacted Ms. Sutton to remind her of her required testimony in a significant drug possession and distribution case, for which Ms. Sutton had been served notice on August 20, 2025. Ms. Sutton did not respond to Plaintiff's calls. Plaintiff then texted Ms. Sutton instructing her to contact the State's Attorney's Office, as she had refused to return their calls. As a result, the State's Attorney's Office negotiated a plea agreement less favorable than anticipated. Plaintiff reported this matter to Captain Hinson.

D. On or about July 24, 2025, Plaintiff directed Ms. Sutton to contact five officers whose evidence documentation required corrections before submission for analysis. Plaintiff later learned that Ms. Sutton began leave on August 26, 2025, without completing this directive, requiring Plaintiff to personally contact the officers to secure the necessary corrections.

13. Throughout this period, Plaintiff sent emails and held weekly meetings with Captain Hinson regarding Ms. Sutton's deficient work performance.

14. Despite repeated documented deficiencies, Captain Hinson took no disciplinary action against Ms. Sutton. In fact, Captain Hinson and Chief Todd told the Plaintiff that they did not want to deal with Deanna Sutton because Ms. Sutton would turn it into a racial issue.

15. In response to Plaintiff's efforts to address concerns regarding Ms. Sutton's work performance and job responsibilities, Ms. Sutton lodged a complaint with Ina Holden, the Director of Administrative Services, alleging that Plaintiff had created a hostile work environment. The allegations were false and unfounded. Plaintiff was informally advised that Ms. Sutton characterized Plaintiff as "mean" and "nitpicking" in support of her complaint.

16. Plaintiff was never notified of the specific allegations made against her, nor was she provided a meaningful opportunity to respond to, rebut, or otherwise contest the accusations before adverse employment actions were taken against her.

17.  On or about October 28, 2025, Chief Justin Todd, at the direction of Ina Holden, stripped of her responsibility for overseeing the Evidence Room and divested of her supervisory authority over Ms. Sutton. Upon information and belief, these actions were taken solely in response to Ms. Sutton's verbal complaint to Human Resources and without any investigation into the truthfulness of the allegations.

18. On November 6, 2025 Plaintiff was involuntarily transferred to the Road Patrol Division, where she was assigned a rotating schedule of day and night shifts. This transfer resulted in a significant and material adverse change to Plaintiff's duties, responsibilities, schedule, and working conditions.

19. Plaintiff was further informed that no internal investigation would be conducted regarding Ms. Sutton's accusations and that management would take no steps to determine whether the allegations against Plaintiff had any factual basis. Nevertheless, Defendants relied upon those unsubstantiated allegations as the basis for removing Plaintiff from her position in CID and eliminating her supervisory responsibilities.

20. Chief Todd advised Plaintiff that he had discussed Ms. Sutton's complaint against Plaintiff with Glenn Steckman, the City Manager for the City of Cambridge. According to Chief Todd, both he and Mr. Steckman believed that Ms. Sutton's allegations lacked merit and were unfounded. Despite recognizing the complaint as baseless, neither Captain Hinson nor Mr. Steckman took any action to challenge, prevent, or mitigate the adverse employment actions taken against Plaintiff as a result of the complaint.

21. Upon information and belief, instead of being disciplined, Ms. Sutton was rewarded with a position in the Records Department.

22. Plaintiff's work performance met the reasonable expectations of her employer.

## IV. <u>DEFENDANT'S UNLAWFUL OFFICIAL POLICY OF DISCRIMINATION AGAINST WHITE EMPLOYEES.</u>

23.  Ms. Sutton's racially charged views were well known within the Cambridge Police Department. On multiple occasions, she accused White police officers of being racist and corrupt. In another incident, Ms. Sutton told a White employee not to sit at a particular table because it was reserved for Black employees.

24. Upon information and belief, Defendant's management was aware of Ms. Sutton's

conduct and racially divisive statements but failed to investigate, discipline, or otherwise take corrective action.

25. The reason that the White Plaintiff was removed from her position and no one challenged Deanna Sutton's work or racially hostile bias toward White employee is because Defendant maintained and enforced a pattern and practice of disparate disciplinary treatment based upon race. Specifically, when Black employees engaged in workplace misconduct, violations of policy, or conduct warranting corrective action, Defendant frequently overlooked such conduct, imposed little or no discipline, or, in certain instances, rewarded the offending employee. This disparate treatment was particularly evident in circumstances involving conflicts or complaints between Black and White employees.

26. Conversely, White employees accused of similar or less serious conduct were subjected to significantly harsher disciplinary measures. Defendant routinely imposed greater discipline upon White employees, scrutinized their conduct more aggressively, and, in response to complaints lodged by Black employees, reassigned, removed, or otherwise altered the working conditions of White employees regardless of whether the allegations against them were substantiated. As a result, Defendant's disciplinary practices were not applied uniformly but instead operated in a manner that favored Black employees and disadvantaged White employees.

27. The following are some examples, which are not exhaustive, demonstrate discrimination against White employees:

A. In October 2022, Chief Justin Todd was informed that then-Sergeant Antoine Patton, who is Black, allegedly used his position to influence, fraternize with, and engage in relationships with two female recruits in violation of department policy. He was not disciplined. Chief Todd then promoted him to the rank of Captain, even though he was ineligible for that position because he failed the promotional process for lieutenant..

B. In April 2024, then–Cpl. Joseph Jones, who is Black, improperly investigated a kidnaping/abduction case involving a ten-year-old girl taken by a mentally ill, non-custodial family member. Although concerned relatives notified him on April 11, 2024, he did not file a missing-person report until April 22, 2024, and only after persistent pressure from the family. The child was ultimately found on April 23, 2024, in a vehicle with the non-custodial family member by the New York Police Department, starved and emotionally traumatized.

C. Plaintiff submitted a detailed complaint against Cpl. Joseph Jones who is Black, for dereliction of duty, citing multiple policy violations and his history of similar misconduct. No disciplinary action was taken. Instead, the Cambridge Police Department selected him as its 2024 Officer of the Year and awarded him several

prestigious honors.

D.   In contrast, Pfc. Nicholas Gonzalez, who is White, faced severe disciplinary consequences after being accused of asking for a hug from a woman during a December 2018 traffic stop.

E.   Cadet Mullians failed out of the police academy, his request to repeat the academy was denied and was terminated from the Cambridge Police Department. In contrast, a Black Cadet failed out of the Police Academy, but was allowed to repeat the academy training and became employed by the Cambridge Police Department.

F.   Cpl. Logan Rippons, who is White was initially denied promotion to the position of Sergeant in because, according the city officials and the Cambridge Police Department, a black officer needed to be promoted first.

28. Defendant's policy reflected that Defendant's disciplinary and promotional decisions were influenced by the race of the employees involved rather than by legitimate, nondiscriminatory considerations. Such disparate treatment created unequal terms and conditions of employment and constitutes evidence of intentional race discrimination in violation of applicable federal and state anti-discrimination laws.

29. The discriminatory and retaliatory policies and practices at issue originated within the office of Ina Holden, Director of Administrative Services for the City of Cambridge, including the Cambridge Police Department. As Director of Administrative Services, Ms. Holden exercised authority over the City's Human Resources Department and possessed final or substantial policymaking authority with respect to personnel matters, employee discipline, and the administration of employment policies. Accordingly, Ms. Holden's actions, decisions, and directives may fairly be attributed to the municipality itself because she acted as a policymaking official on behalf of the City.

30. The evidence further demonstrates that Ms. Holden exercised extraordinary influence throughout municipal government. Upon information and belief, Chief Todd, as well as senior management officials within the Cambridge Police Department, were reluctant to challenge, oppose, or question Ms. Holden's decisions and directives. This atmosphere of deference and fear effectively insulated Ms. Holden from meaningful oversight and review and allowed her personnel decisions and employment practices to be implemented without scrutiny. The unwillingness of senior officials to confront or challenge Ms. Holden further evidences the breadth of her authority and the practical reality that her decisions carried the force of municipal policy.

6

31. Ms. Holden's influence over personnel matters extended beyond senior management and permeated the operations of the Police Department. Upon information and belief, supervisory police officers and other employees of the Police Department feared adverse employment consequences if they reported misconduct, performance deficiencies, or disciplinary concerns involving Black employees. Because Ms. Holden exercised substantial control over personnel decisions, discipline, promotions, and other employment actions, employees reasonably believed that complaints concerning Black employees would not be fairly considered and could instead subject the complaining employee to retaliation or adverse treatment. As a result, legitimate complaints and disciplinary concerns were suppressed, discouraged, or left unreported.

32. This chilling effect fostered and reinforced a workplace environment in which disciplinary standards were applied unevenly and in which employees were deterred from reporting misconduct based upon a reasonable fear of reprisal. The existence of such fear among supervisory personnel and rank-and-file employees is evidence of a longstanding custom and practice within the City whereby complaints involving Black employees were treated differently from complaints involving White employees. It further demonstrates that discriminatory personnel practices were sufficiently widespread and well known that employees altered their conduct in response to them.

33. Moreover, the record demonstrates that Ms. Holden's actions were known to, approved by, and ratified by Glenn Steckman, the City Manager. As City Manager, Mr. Steckman possessed final policymaking authority concerning municipal operations and personnel administration. By approving, endorsing, or otherwise ratifying Ms. Holden's conduct, Mr. Steckman transformed that conduct into official municipal policy, rendering the City responsible for the resulting constitutional and statutory violations.

34. Alternatively, even if Ms. Holden's conduct is not deemed to constitute official policy in its own right, the City remains liable because Mr. Steckman, despite possessing supervisory and policymaking authority, failed to adequately monitor, investigate, or correct Ms. Holden's unlawful conduct. Mr. Steckman was aware, or reasonably should have been aware, of the discriminatory and retaliatory practices occurring within the Human Resources function under Ms. Holden's direction. Nevertheless, he failed to take appropriate remedial action, thereby exhibiting deliberate indifference to the substantial risk that employees' federally protected rights would be violated.

35. Mr. Steckman's deliberate indifference is particularly significant given the widespread perception among senior municipal officials, supervisory police officers, and other City employees

7

that Ms. Holden wielded considerable power and influence over employment decisions. Despite circumstances that should have prompted heightened oversight and accountability, Mr. Steckman permitted Ms. Holden to continue exercising authority over personnel matters without meaningful supervision or intervention. His failure to act in the face of known risks and complaints constituted a conscious disregard for the rights of municipal employees and effectively communicated the City's approval of the unlawful conduct.

36. Such deliberate indifference by a final policymaking official constitutes more than mere negligence. Rather, it reflects a conscious disregard for known or obvious consequences and directly contributed to the continuation of discriminatory and retaliatory employment practices. Accordingly, whether through Ms. Holden's exercise of policymaking authority, Mr. Steckman's ratification of her conduct, or his deliberate indifference to known unlawful actions, the challenged conduct may fairly be said to represent official municipal policy and custom. The actions and omissions of these policymakers are therefore attributable to the City itself, rendering the municipality liable for the resulting violations of Plaintiff's rights.

Plaintiff's involuntary reassignment from the Criminal Investigation Division to the Road Patrol Division constituted a materially adverse employment action. As a direct and proximate result of Defendant's actions, Plaintiff suffered significant emotional distress, humiliation, embarrassment, damage to her professional reputation, diminished career advancement opportunities, and a loss of professional standing within the Cambridge Police Department.

37. Plaintiff filed her Charge of Discrimination and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC") on, or about January 26, 2026. The EEOC issued a Determination and Notice of Right to Sue on April 23, 2026.

## V. CAUSES OF ACTION.

### COUNT ONE
### Intentional Discrimination
### Violation of 42 U.S.C. § 2000e, *et seq.*

38. The foregoing paragraph are incorporated herein.

39. Defendant subjected Plaintiff, a White employee, to disciplinary action by removing her from a prestigious supervisory assignment within the Criminal Investigation Division based solely upon unsubstantiated and false allegations made by Deanna Sutton, a Black subordinate. Defendant took this adverse action without conducting any meaningful investigation into the allegations or

8

affording Plaintiff an opportunity to respond. In contrast, Defendant routinely failed to discipline Ms. Sutton and other similarly situated Black employees whose performance deficiencies, misconduct, and failure to meet departmental standards were known to management and substantially below legitimate departmental expectations.

40. Defendant's actions were intentional, discriminatory, on account of Plaintiff's race. By treating Plaintiff less favorably than similarly situated Black employees with respect to discipline, job assignments, and the terms and conditions of employment, Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

41.  As a result of Defendant's unlawful actions the Plaintiff has been damaged, as aforesaid.

**WHEREFORE,** Plaintiff respectfully requests the following relief:

A. Judgment against Defendant in favor of the Plaintiff;

B. Compensatory damages in the amount of $500,000.00;

C. Punitive damages in the amount of $1,000,000.00;

D. Reasonable attorney's fees and litigation expenses; and

E. Such other and further relief as the Court deems just and proper.

## COUNT TWO
### Racially Hostile Work Environment
### Violation of 42 U.S.C. § 2000e, *et seq.*

42. The foregoing paragraph are incorporated herein.

43. Throughout her employment, Plaintiff was subjected to a workplace environment in which Black employees were routinely afforded preferential treatment, while White employees, including Plaintiff, were subjected to heightened scrutiny, harsher discipline, and less favorable terms and conditions of employment.

44. Defendant, through its managers, supervisors, and policymakers, maintained and enforced practices whereby complaints made by Black employees against White employees were accepted at face value and acted upon without meaningful investigation, while complaints regarding Black employees were ignored, minimized, or disregarded.

45. As alleged herein, Plaintiff was removed from a prestigious supervisory assignment, stripped of significant responsibilities, and reassigned to Road Patrol based upon unsubstantiated allegations made by a Black subordinate. Defendant took these actions without conducting any meaningful investigation and without providing Plaintiff an opportunity to respond to the

9

accusations against her.

46. Upon information and belief, Defendant's management officials were aware that similarly situated Black employees engaged in misconduct, demonstrated performance deficiencies, and failed to meet departmental standards, yet were not subjected to comparable discipline or adverse employment actions.

47. Defendant's conduct created an intimidating, humiliating, and offensive work environment for Plaintiff because of her race. The disparate treatment of White employees, including Plaintiff, was sufficiently severe and pervasive to alter the terms, conditions, and privileges of Plaintiff's employment and to create an abusive working environment.

48. Defendant knew or should have known of the racially hostile work environment to which Plaintiff was subjected. The discriminatory conduct was carried out by supervisory and management personnel acting within the scope of their authority, and Defendant failed to take prompt and effective remedial action.

49. Defendant's conduct violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

50. As a result of Defendant's unlawful actions, the Plaintiff was damaged, as aforesaid

**WHEREFORE,** Plaintiff respectfully requests the following relief:

A. Judgment against Defendant in favor of the Plaintiff;

B. Compensatory damages in the amount of $500,000.00;

C. Punitive damages in the amount of $1,000,000.00;

D. Reasonable attorney's fees and litigation expenses; and

E. Such other and further relief as the Court deems just and proper.

### COUNT THREE
### Retaliation
### Violation of 42 U.S.C. § 2000e-3(a)

51. The foregoing paragraph are incorporated herein.

52. The adverse employment actions taken against Plaintiff must be viewed within the broader context of Defendant's racially discriminatory policies, practices, and customs within the Cambridge Police Department. Under those policies and practices, Plaintiff's legitimate supervisory concerns regarding the deficient work performance and conduct of a Black subordinate were improperly recast as a racial issue, resulting in heightened scrutiny of Plaintiff and preferential

10

treatment of the subordinate employee.

53. Against that backdrop, Defendant removed Plaintiff, a White employee, from her position within the Criminal Investigations Division ("CID"), stripped her of responsibility for supervising the Evidence Room, and involuntarily transferred her to the Road Patrol Division. These actions were taken shortly after Plaintiff raised concerns regarding the performance and conduct of a Black employee and were motivated, at least in part, by Defendant's policy and practice of protecting Black employees from criticism while subjecting White employees to adverse treatment. As such, Defendant's actions constitute unlawful retaliation in violation of Title VII.

54. Prior to filing her Charge of Discrimination with the EEOC, Plaintiff consistently received exemplary performance evaluations. Following the filing of her Charge, however, Defendant significantly downgraded Plaintiff's evaluation. Despite Plaintiff's extensive supervisory experience with Defendant and other law enforcement agencies, Defendant suddenly characterized her as a "very inexperienced supervisor" and criticized her for needing to "develop a less adversarial means of conflict resolution."

55. The timing and nature of the downgraded performance evaluation demonstrate that it was issued in retaliation for Plaintiff's protected complaints concerning Deanna Sutton and her subsequent filing of a Charge of Discrimination with the EEOC.

56. Defendant's unlawful actions constitute retaliation in violation of 42 U.S.C. § 2000e-3(a).

57. As a result of Defendant's unlawful actions, the Plaintiff was damaged, as aforesaid

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant and award the following relief:

A. Judgment against Defendant in favor of the Plaintiff;

B. Compensatory damages in the amount of $500,000.00;

C. Punitive damages in the amount of $1,000,000.00;

D. Reasonable attorney's fees and litigation expenses; and

E. Such other and further relief as the Court deems just and proper.


**COUNT FOUR**
**Intentional Discrimination**
**Violation of 42 U.S.C. § 1981**

58. The foregoing paragraph are incorporated herein.

11

59. Section 1981 of the Civil Rights Act of 1866 prohibits discrimination in employment on the basis of race.

60. Defendant's actions, as aforesaid, were intentional, discriminatory, on account of Plaintiff's race. By treating Plaintiff less favorably than similarly situated Black employees with respect to discipline, job assignments, and the terms and conditions of employment, Defendant violated 42 U.S.C. § 1981.

61. As a result of Defendant's unlawful actions, the Plaintiff was damaged, as aforesaid.

**WHEREFORE,** Plaintiff respectfully requests following relief:

A. Judgment against Defendant in favor of the Plaintiff;

B. Compensatory damages in the amount of $500,000.00;

C. Punitive damages in the amount of $1,000,000.00;

D. Reasonable attorney's fees and litigation expenses; and

E. Such other and further relief as the Court deems just and proper.


### COUNT FIVE
### Racially Hostile Work Environment
### Violation of 42 U.S.C. § 1981

62. The foregoing paragraph are incorporated herein.

63.  Defendant's unlawful conduct, as aforesaid, toward the Plaintiff created a severe and hostile work environment and engaged in numerous acts of discrimination.

64. The unlawful treatment of the Plaintiff  by the Defendant, its agents and employees, as aforesaid, constitutes a violation of  42 U.S.C. § 1981.

65. As a result of Defendant's unlawful actions, the Plaintiff was damaged, as aforesaid

**WHEREFORE,** Plaintiff respectfully requests the following relief:

A. Judgment against Defendant in favor of the Plaintiff;

B. Compensatory damages in the amount of $500,000.00;

C. Punitive damages in the amount of $1,000,000.00;

D. Reasonable attorney's fees and litigation expenses; and

E. Such other and further relief as the Court deems just and proper.

12

## COUNT SIX
### Retaliation
### Violation of 42 U.S.C. § 1981

66. The foregoing paragraph are incorporated herein.

67. The adverse employment actions taken against Plaintiff must be viewed within the broader context of Defendant's racially discriminatory policies, practices, and customs within the Cambridge Police Department. Under those policies and practices, Plaintiff's legitimate supervisory concerns regarding the deficient work performance and conduct of a Black subordinate were improperly recast as a racial issue, resulting in heightened scrutiny of Plaintiff and preferential treatment of the subordinate employee.

68. Against that backdrop, Defendant removed Plaintiff, a White employee, from her position within the Criminal Investigations Division ("CID"), stripped her of responsibility for supervising the Evidence Room, and involuntarily transferred her to the Road Patrol Division. These actions were taken shortly after Plaintiff raised concerns regarding the performance and conduct of a Black employee and were motivated, at least in part, by Defendant's policy and practice of protecting Black employees from criticism while subjecting White employees to adverse treatment. As such, Defendant's actions constitute unlawful retaliation in violation of 42 U.S.C. § 1981.

69. Prior to filing her Charge of Discrimination with the EEOC, Plaintiff consistently received exemplary performance evaluations. Following the filing of her Charge, however, Defendant significantly downgraded Plaintiff's evaluation. Despite Plaintiff's extensive supervisory experience with Defendant and other law enforcement agencies, Defendant suddenly characterized her as a "very inexperienced supervisor" and criticized her for needing to "develop a less adversarial means of conflict resolution."

70. The timing and nature of the downgraded performance evaluation demonstrate that it was issued in retaliation for Plaintiff's protected complaints concerning Deanna Sutton and her subsequent filing of a Charge of Discrimination with the EEOC.

71. As a result of Defendant's unlawful actions, the Plaintiff was damaged, as aforesaid

**WHEREFORE,** Plaintiff respectfully requests the following relief:

A. Judgment against Defendant in favor of the Plaintiff;

B. Compensatory damages in the amount of $500,000.00;

C. Punitive damages in the amount of $1,000,000.00;

13

D. Reasonable attorney's fees and litigation expenses; and

E. Such other and further relief as the Court deems just and proper.

_____/s/_____
John B. Stolarz
USDC No.: 01929
The Stolarz Law Firm
6509 York Road
Baltimore, MD 21212
(410) 532-7200
(410) 372-0529 (fax)
stolarz@verizon.net

Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Rebecca Clark, Plaintiff, demands a jury trial on all issues.

_____/s/_____
John B. Stolarz

Attorney for Plaintiff

W:\5553\Pleadings-New\Complaint.wpd

14